UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

|  |  |
|---|---|
| JOHN DOE and JESSICA DOE<br>*as next friend of their minor child*,<br>JANE DOE<br>                        *Plaintiffs*<br><br>v.<br><br>LAKE SUNAPEE YACHT CLUB, INC.,<br> and JUSTIN DAVIS<br>                        *Defendants* | CIVIL ACTION NO. _____ |

**COMPLAINT & JURY DEMAND**

1.  John Doe and Jessica Doe bring this Complaint as next friends of their minor daughter, Jane Doe, against Lake Sunapee Yacht Club ("LSYC") and Justin Davis, in his individual capacity, to secure relief for their unlawful workplace discrimination and harassment.

2.  Jane Doe seeks relief under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-5 *et seq.*, RSA chapter 354-A, and the New Hampshire common law.

**PARTIES**

3.  Plaintiff, Jane Doe, is a minor who resides with her parents, John Doe and Jessica Doe, in Sunapee, New Hampshire.

4.  Defendant, LSYC, is a New Hampshire non-profit corporation with a principal place of business located at 34 Stone End Road, Sunapee, New Hampshire. It owns and operates a yacht club of the same name on the western shore of Lake Sunapee.

1

5. Defendant, Justin Davis, is an individual who resides at 199 Main Street, Apartment 2, Mexico, Maine. At all times relevant to this complaint, Mr. Davis was the Executive Chef at LSYC and was Jane Doe's supervisor.

## JURISDICTION AND VENUE

6. This Court has subject matter jurisdiction over Jane Doe's Title VII claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 2000e-5(f)(3).

7. This Court has subject matter jurisdiction over Jane Doe's state-law claims pursuant to 28 U.S.C. § 1367(a) because these claims arise out of the same factual transaction or occurrence giving rise to Jane Doe's federal claims.

8. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events and omissions giving rise to Jane Doe's claims occurred in New Hampshire.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

9. John Doe and Jessica Doe, on behalf of their minor child, Jane Doe, timely instituted a charge of discrimination in the New Hampshire Human Rights Commission and the Equal Employment Opportunity Commission on November 28, 2023.

10. The charge of discrimination concerned the sexual harassment Jane Doe suffered at LSYC prior to that date.

11. The charge of discrimination was pending for more than one hundred and eighty days.

12. The New Hampshire Commission for Human Rights dismissed this matter without prejudice by notice dated September 6, 2024. The Equal Employment Opportunity Commission issued a Notice of Right to Sue on October 10, 2024.

## FACTS

13. LSYC is a non-profit social club that operates a yacht club on Lake Sunapee during the summer season. It hires many high school and college-aged individuals, many of whom are minors, to work in their commercial kitchen and snack bar.

14. LSYC serves lunch six days per week and dinner four days per week during the summer season. It also hosts numerous yachting events with participants from around the country. LSYC advertises itself and its dining services online, has out-of-state members who travel to LSYC to use its facilities, and obtains goods and services from outside New Hampshire. In other words, LSYC is engaged in an industry that affects interstate commerce.

15. During the 2023 summer season, LSYC employed forty-two minors. It has as many as seventy three employees, and it has at least fifteen employees in each working day for the last twenty weeks in the preceding year.

### Jane Doe Begins Working at LSYC

16. Jane Doe understood that LSYC hired many teenagers. Thus, on or about June 14, 2023, she applied to work as a line cook at LSYC for its 2023 summer season when she was only fourteen years old. She was subsequently hired and attended orientation on June 15.

17. Jane Doe had every reason to expect that she would be entering a respectful and professional environment. LSYC holds itself out to the public as being "a Work Environment Built Around Respect" on the "Employment Opportunities" page of its website where Jane Doe applied for employment. Its handbook also states: "All employees should be able to enjoy a work environment free of discrimination and harassment. LSYC will not tolerate harassment of any type."

18. Jane Doe began working her regular shifts on or about June 22, 2023.

**Jane Doe Suffers a Barrage of Sexual Harassment**

19. Almost immediately, Jane Doe suffered a barrage of unwelcome sexual conduct at the hand of her supervisor—the executive chef, Justin Davis ("Davis").

20. For example, while in the kitchen, Davis frequently grabbed young male employees from behind—involuntarily embracing them—while making eye contact with Jane Doe. During these interactions, he made unwelcome comments to the effect that he knew he could not hug Jane Doe in the same way, and that he should give her a "safety hug" instead.

21. Jane Doe was only fourteen years old, and she did not ask for or initiate any physical contact with the much older executive chef.

22. Nevertheless, Davis chased Jane Doe around the kitchen as he tried to make unwanted physical contact with her. When this would happen, Jane Doe had to flee to a separate part of the kitchen to avoid Davis' unwanted advances.

23. Davis' conduct did not occur in a vacuum. Davis told Jane Doe that he dated much younger women and that the "sex was good" with those much younger women. And, on at least one occasion, Davis grabbed a female employee against her will to complain that she was wearing nail polish while Jane Doe was present.

24. In another incident, Davis told Jane Doe that she should pursue opportunities in making pornography. Specifically, he told Jane Doe that one of his good friends ran an "OnlyFans" page that focused on foot-fetish pornography, and that this would be an appropriate and lucrative way for his fourteen-year-old subordinate to earn substantial other income.

25. In yet another incident, Davis spoke in graphic terms about "fluffing," which is a job performed on the set of pornography films in which someone is required to manipulate a

male actor's genitals to facilitate a performance. During this conversation, he also pantomimed the act.

26. Davis frequently made crude sexual joke about "beating his meat" when he was handling meat products in the kitchen.

27. Jane Doe was extremely uncomfortable during these interactions with Davis. However, she was initially afraid to speak up to anyone in management because of the control Davis had over her employment and the employment of her colleagues.

### LSYC Knew About Davis' Sexual Harassment

28. LSYC was aware of Davis' inappropriate conduct. Over the summer, it received numerous complaints against Davis.

29. On or about July 4, a dining room server submitted an incident report to Marilyn Chalker, who is listed under "Management & Staff" in the LSYC 2023 Employee Manual. She served as LSYC's bookkeeper.

30. The incident report indicates that, on July 3, the dining room server heard Davis say to a "young girl" that he "was not a rapist or pedophile" and that "she should feel safe here."

31. On July 25 and July 26, LSYC received numerous complaints against Davis. These complaints were submitted to Tonia White, an officer of LSYC.

32. One of these reports explained that Davis had discussed "genital piercings" with the receptionist/assistant bar manager and another dining room server.

33. A female operations supervisor also reported that, on July 13, Davis told her that he loved her and her menus, and then he "stayed in the doorway for [another] 30 seconds." She also reported that in early July 2023, Davis had "grabbed [her] shoulders" and "said something

about the walk-in [freezer] being messy" after she opened the walk-in while "giving 3-4 new staff a tour of the club."

34. Another wait staff floor supervisor submitted four incident reports to Ms. White. The reports claims that (a) in "early July" Davis yelled at her for asking him a question and answering a question posed by another male kitchen worker; (b) in July 2023, Davis discussed an incident at a prior workplace where a member of the wait staff reported being hugged by a chef and ridiculed the employee for making the report; (c) in "mid July" 2023, she overheard Davis talking about "his ex-girlfriend's breasts" (which was the "most graphic" thing she had ever heard him say); and (d) on July 25, "Justin grabbed [her] shoulder and said 'I'm behind you' instead of asking [her] to move."

35. Another dining room server submitted an incident report to Ms. White stating that Davis replied "woman" while he "shook his head lightly" in response to her saying that she would be done putting the ketchup away "in a few seconds – in a n[e]utral tone" after he told her he was organizing the refrigerator.

36. Yet another dining room server submitted an incident report to Ms. White, stating that Davis invited her to his apartment to see if she wanted any "special gummies" and, on another occasion, grabbed her arms and asked her how she was "so strong."

37. LSYC's general manager, Ali Mahra, heard reports of certain inappropriate remarks that Davis made in July 2023.

38. LSYC took no action to stop Davis' harassment of his subordinates.

39. On one occasion, Davis remarked, in Jane Doe's presence, that LSYC's management lectured him about his conduct, stating that he had been told he was committing "sexual harassment."

6

40. Based on these comments, LSYC knew that Davis sexually harassed his subordinates, but it still continued to employ him.

41. By continuing to engage in unwanted sexual conduct after admitting that management had lectured him about "sexual harassment," Davis aided and abetted LSYC's violation of RSA chapter 354-A.

### Jane Doe Reports Davis' Sexual Advances

42. As the end of the summer season approached, other LSYC employees, who were preparing to leave for college, grew concerned about leaving Jane Doe in the kitchen alone with Davis.

43. One employee spoke to Jane Doe's sister, and Jane Doe's parents became aware of Davis' treatment of their fourteen-year-old daughter.

44. On August 2, Jane Doe and her mother met with LSYC's general manager, Ali Mahra ("Mahra") to discuss Davis' conduct. Mahra appeared to take Jane Doe's concerns seriously. He told Jane Doe that, although this would be her last day, he would pay her through the end of the workweek. Later that day, he informed Jane Doe's mother that Davis' employment was terminated.

45. Mahra told Jane Doe and her mother that he was unaware of Davis' behavior at the time of this report.

46. This statement was categorically untrue. Mahra knew, or at a bare minimum should have known, of Davis' ongoing, severe, and pervasive harassment of Jane Doe because another minor female employee submitted a written complaint about Davis' treatment of Jane Doe earlier that summer.

47. LSYC failed to take the written complaints against Davis seriously. It did not conduct an investigation, or even speak to Jane Doe to try to corroborate the facts complained about. Instead, it put its head in the sand, allowing a powerful, older male to supervise and harass vulnerable young employees.

48. Jane Doe has experienced significant emotional distress as a result of Davis' actions. She has suffered humiliation, powerlessness, and anger as a result of being preyed upon by Davis.

49. She has also suffered emotional distress because LSYC knew about Davis' sexual harassment of her and failed to take action.

50. Jane Doe dreamed of a career in the culinary field. As a result of the grotesque experiences she suffered at LSYC she may not be able to pursue a career she was passionate about.

51. LSYC terminated Davis immediately after Jane Doe complained about his behavior, but not following any of the previous complaints made about the unwanted sexual conduct to which he subjected his staff.

52. On information and belief, LSYC's only effort to address Mr. Davis's conduct was an oral warning—the aforementioned "lecture" about "sexual harassment."

53. Despite its knowledge of Mr. Davis's ongoing sexual harassment of the staff, including numerous minors, that he supervised, LSYC continued to employ him until such time as Jane Doe's mother became aware of this conduct and reported it to Mahra.

### COUNT I – SEX DISCRIMINATION & HARASSMENT
### (LSYC - Title VII and RSA chapter 354-A)

54. As described in this Complaint, Jane Doe was subjected to discrimination and harassment on the basis of her sex.

55. On the basis of her sex, Jane Doe was subject to repeated instances of unwelcome sexual conduct and comments from her much older supervisor, executive chef Davis.

56. The repeated offensive comments and conduct were so severe and pervasive that they created an offensive and demeaning work environment for Jane Doe, and they interfered with her ability to perform her job.

57. LSYC had actual knowledge of the sex-based harassment because its officers and managers received reports of Davis' inappropriate conduct and comments toward Jane Doe and other employees.

58. Jane Doe did not welcome, encourage, or consent to the sex-based harassment to which she was subjected as an employee at LSYC. Other female LSYC employees likewise did not welcome, encourage or consent to Mr. Davis's sex-based conduct and comments.

59. By allowing Jane Doe to suffer sex-based harassment at work, and in failing to take remedial steps to prevent this gender-based discrimination, LSYC violated Title VII and RSA chapter 354-A.

60. As a direct and proximate result LSYC's unlawful employment practices, Jane Doe incurred damages in the form of lost wages, compensatory damages, enhanced compensatory damages, punitive damages, attorneys' fees and costs.

### COUNT II – AIDING AND ABETTING
**(Davis – RSA chapter 354-A)**

61. For the reasons discussed in this Complaint, LSYC engaged in unlawful discriminatory practices against Jane Doe.

62. Davis aided and abetted LSYC in this discriminatory practice because he personally made inappropriate sexual comments and engaged in inappropriate sexual conduct giving rise to LSYC's discriminatory practices.

9

63. Davis knew that his conduct constituted sexual harassment because LSYC's management team lectured him about this topic. By engaging in a pattern of unwelcome comments and physical conduct that he directed toward Jane Doe and other female employees, which was sufficiently severe and pervasive to alter the working conditions for these female employees, and by continuing his pattern of harassing behavior while mockingly describing the lecture he had received, Mr. Davis aided and abetted the violations of RSA 354-A described herein.

64. As a direct and proximate result of Davis' conduct, Jane Doe incurred damages in the form of lost wages, compensatory damages, enhanced compensatory damages, punitive damages, attorneys' fees and costs.

## COUNT III—INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Davis and LSYC—New Hampshire Common Law)

65. Mr. Davis' conduct toward Jane Doe—from making suggestive comments, to physically chasing her around the kitchen attempting to make unwanted physical contact with her, to graphically describing his sexual encounters with younger women, to suggesting that then-fourteen-year-old Jane Doe should consider appearing in pornographic recordings—was extreme, outrageous and intentional conduct.

66. This conduct caused extreme emotional distress to Jane Doe.

67. Mr. Davis committed these acts in the course of his employment with LSYC, during working hours, in the kitchen he was charged with supervising, and LSYC had actual and constructive knowledge of the aforementioned extreme and outrageous behavior.

68. LSYC's conduct toward Jane Doe when it knew about the risks posed by Mr. Davis, and specifically the risks he posed to Jane Doe, was reckless; having knowledge of the specific risks that Mr. Davis posed to Jane Doe, and cognizant of the likely emotional harm that

Mr. Davis would inflict on a 14-year-old girl who he supervised, LSYC failed to separate Mr. Davis and Jane Doe, and failed to take any other action.

69.   This failure, under the circumstances, constituted extreme and outrageous conduct. LSYC had knowledge that Mr. Davis was supervising employees, like Jane Doe, of very tender years, but refused to remove him from his position until the end of the busy summer season, placing the club's financial well-being above the physical and emotional well-being of their staff despite knowing the risks this posed.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Jane Doe, respectfully seeks all remedies available under applicable law, to include:

A.  Compensatory damages;

B.  Enhanced compensatory damages;

C.  Punitive damages;

D.  Reasonable attorneys' fees, interest, and costs;

E.  All available pre-judgment and post-judgment interest;

F.  Such other relief as is just and equitable.

## **JURY DEMAND**

Jane Doe respectfully demands a trial by jury on all issues so triable.

                                             Respectfully submitted,

                                             JOHN DOE and JESSICA DOE,
*as next friend of their minor child*
JANE DOE

                                             By their attorneys,

                                             DEVINE, MILLIMET & BRANCH, P.A.

Dated: October 21, 2024                    By:*/s/ Pierre A. Chabot*_____
                                                           Pierre A. Chabot (Bar No. 17606)
                                                           Richard P. Driscoll (Bar No. 273678)
                                                           111 Amherst Street
                                                           Manchester, NH 03101
                                                           (603) 669-1000
                                                           pchabot@devinemillimet.com
                                                           rdriscoll@devinemillimet.com